**UNITED STATES of America, Appellee,**

v.

**Robert E. BALES, a/k/a Bob Bailes, a/k/a Robert E. Bailes, Appellant.**

**No. 86–5646.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 14, 1986.

Decided March 18, 1987.

---

Sheila McGough, Alexandria, Va., on brief, for appellant.

Clarence Holland Albright, Jr., Asst. U.S. Atty., Arlington, Va., (Henry E. Hudson, U.S. Atty., Kenneth E. Melson, Asst. U.S. Atty., Arlington, Va., on brief), for appellee.

Before WIDENER and ERVIN, Circuit Judges, and BOYLE, District Judge for the Eastern District of North Carolina, sitting by designation.

ERVIN, Circuit Judge:

Robert Bales [1] made three too many trips to the bank. This appeal arises from Bales' convictions for bank fraud, making false statements to a bank, and falsely representing his social security number. On appeal, Bales attacks, among other things: the sufficiency of the evidence to

---

1. Defendant-appellant Bales has several aliases. The indictment refers to him as "Robert Eugene Bales, a/k/a Bob E. Bailes, a/k/a Robert E. Bailes." For the sake of brevity and consistency, we adopt the shortest version of his surname in this opinion.

convict him; the legality of a search of his car; the district court's refusal to allow certain defense witnesses to testify; and the constitutionality of 42 U.S.C.A. § 408(g) (West 1976), which makes false representation of one's social security number a felony. We reject Bales' creative but meritless arguments and affirm his convictions.

## I.

This case stems from Bales' transactions with Central Fidelity Bank ("Central Fidelity"), Dominion Federal Savings and Loan ("Dominion"), and First Virginia Bank ("First Virginia"). Bales supplied these Virginia-based institutions with a wealth of false information. He submitted documents to them referring to nonexistent accountants, real estate agents, automobiles, and social security numbers.

### A. *Central Fidelity Bank*

On November 1, 1985, Bales, as president of Preferred Research, Inc., arranged to buy two cars for the corporation from Alex Arnold (doing business as Arnold Financial Services). According to the bills of sale, these cars were a 1981 Volkswagen Rabbit and a 1983–84 Audi. Total cost of the cars was $16,500; $14,500 was allegedly paid when the sale contract was signed.

On November 17, 1985, Bales visited Betty Stratton, an official at Central Fidelity. He sought a $12,500 loan to finance the purchase of the cars. Bales put up the cars as collateral for the loan. He supplied Central Fidelity with bills of sale, including the Vehicle Identification Number (VIN) of each car. He also gave the bank a personal financial statement showing "5–6–40" as his birthdate and 226–48–5559 as his social security number. Bales never gave the bank title to the cars as collateral. More importantly, he never repaid the loan which he received from Central Fidelity.

### B. *Dominion Federal Savings and Loan*

Bales contacted Dominion in connection with an alleged real estate deal. In Octo-

ber, 1985, Bales ostensibly contracted with Alex Arnold (again doing business as Arnold Financial Services) to buy, remodel, and resell property in Arlington, Virginia. He set about financing this transaction by applying for a loan from Dominion. On the loan application form, he supplied bank officials with the same social security number he had furnished to Central Fidelity. Bales also gave Dominion the same personal and corporate financial statements he had supplied to Central Fidelity, with "Jo Ware," as CPA, printed on them, as well as his 1983 and 1984 tax returns. Bales' piece de resistance was the real estate contract itself, which described the property as 127 North Park Drive, Arlington, Virginia. The contract showed Bales as purchaser, and Jo Ware Associates as the seller's agent. Unable to verify the information provided, Dominion cancelled Bales' application. The bank never actually loaned him any money.

### C. *First Virginia Bank*

As president of "First Corp.," Bales visited First Virginia Bank on December 16, 1985, in an attempt to establish a $20,000 line of credit for this company. Like the other banks, First Virginia received Bales' 1983 and 1984 tax returns, complete with his alleged social security number. First Virginia used the information on Bales' application form to run a credit check on him. Because of his insufficient credit history, the bank eventually denied him the loan.

Bales' trips to the banks earned him a ten-count superseding indictment in the United States District Court for the Eastern District of Virginia. The superseding indictment contained three counts of bank fraud, in violation of 18 U.S.C.A. § 1344 (West Supp. 1986) (counts 1, 4, and 7); three counts of false statements to a bank, in violation of 18 U.S.C.A. § 1014 (West 1976) (counts 2, 5, and 8); and four counts of false representation of a social security number, in violation of 42 U.S.C.A. § 408(g)(2) (West 1983) (counts 3, 6, 9, and 10).

Bales filed several pretrial motions. Among other things, he sought to suppress

evidence seized from his car in May, 1986. After a hearing before the district court on July 18, 1986, this motion was denied. Bales also moved, unsuccessfully, for a bill of particulars.

After waiving his right to trial by jury, Bales was tried on July 29 and 30. On the eve of trial, the government dismissed counts 2, 4, and 7, and Bales successfully moved for a dismissal of count 10 at the close of the government's case. The district court found Bales guilty of the remaining counts, 1, 3, 5, 6, 8, and 9. On September 29, 1986, the district court denied Bales' motion for judgment of acquittal or a new trial.

## II.

On appeal, Bales raises several issues. He claims that: (1) the evidence was insufficient to convict him; (2) the trial court erred in denying his motion for a bill of particulars; (3) the trial court erred in denying his motion for a new trial; (4) the search and seizure of documents from his car was unlawful; (5) the trial court erred in refusing to allow defense witnesses to testify; (6) 42 U.S.C.A. § 408(g)(2) (West 1983) was unconstitutionally applied to convict him; (7) he was erroneously convicted for falsely representing his social security number; and (8) the trial court's restitutionary award was unsupported by proof of loss.

### A. *Sufficiency of the Evidence*

■ Bales attacks nearly every piece of the government's evidence, from the false

birthdate and social security number, to the nonexistence of Jo Ware. In evaluating his challenges, we are mindful of the great discretion accorded to the trial judge. When, as in this case, a jury trial is waived, the judge weighs the evidence, determines the credibility of the witnesses, and finds the facts. *See* 2 C. Wright, *Federal Practice and Procedure* § 374, at 315 (1982). The court may select among conflicting inferences to be drawn from the testimony. *See United States v. Pitts*, 428 F.2d 534, 537 (5th Cir.), *cert. denied*, 400 U.S. 910, 91 S.Ct. 154, 27 L.Ed.2d 149 (1970). In findings on factual issues other than the ultimate issue of guilt, the reviewing court applies the "clearly erroneous" test. *See Campbell v. United States*, 373 U.S. 487, 493, 83 S.Ct. 1356, 1360, 10 L.Ed.2d 501 (1963). On the ultimate issue of guilt, a finding generally must stand if it is supported by substantial evidence. *See Gordon v. United States*, 438 F.2d 858, 868, n. 30 (5th Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971).

■ In order to sustain convictions under 18 U.S.C.A. § 1344 (West Supp. 1986) and 18 U.S.C.A. § 1014 (West 1976), the trier of fact must find that Bales knowingly made false representations to the banks, with the purpose of influencing their actions. *See United States v. Bonnette*, 663 F.2d 495, 497 (4th Cir.1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 666 (1982).[2] Bales claims that the government

---

2. 18 U.S.C.A. § 1344 (West Supp. 1986) provides, in pertinent part:

Whoever knowingly executes, or attempts to execute, a scheme or artifice ... to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises [shall be guilty of an offense against the laws of the United States].

In order to establish that a defendant is guilty of bank fraud, the government must prove beyond a reasonable doubt that:

1. The defendant knowingly executed or attempted to execute a scheme or artifice to obtain money or property by means of false pretenses, representations or promises, and

2. That the money or property obtained or attempted to be obtained by the defendant was owned by or under the custody or control of a federally chartered or insured financial institution.

The second element of the offense has already been established, since the three banks are members of the Federal Deposit Insurance Corporation (FDIC).

18 U.S.C.A. § 1014 (West 1976) provides, in pertinent part:

Whoever knowingly makes any false statement or report, or willfully over-values any land, property or security for the purpose of influencing in any way the action of ... a Federal Savings and Loan Association [or] any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance ... com-

did not prove his fraudulent intent in submitting several bits of information to the banks. He argues, for instance, that the confusion over his actual birthdate and social security number negates a finding of wrongful intent. This argument ignores the longstanding principle that fraudulent intent may be established by circumstantial evidence and by inferences deduced from facts and situations. *See Mitchell v. Union Pacific Railroad Co.*, 188 F.Supp. 869, 872 (S.D.Cal.1960). It also ignores the trial court's ability to sift through conflicting evidence and arrive at the facts.

▪ The court performed this sifting function in rejecting Bales' evidence and accepting the government's evidence. The district judge found that Bales' true birthdate was "6–5–40" and that Bales had submitted to Central Fidelity documents transposing these numbers, showing his birthdate as "5–6–40." The judge acted within his discretion in crediting the government's self-authenticating birth certificate over an affidavit which Bales' father furnished.

The dispute over the existence of the two cars, the 1981 Volkswagen Rabbit and the Audi which Bales purportedly purchased, spawned a great deal of testimonial evidence on both sides. Again, the trial court's decision to credit the government witnesses is supported by substantial evidence. Robertson, the government's expert witness, examined the bills of sale which Bales provided. He stated that the Volkswagen had an invalid Vehicle Identification Number (VIN), since the first digits were inaccurate. Similarly, he testified that the Audi had an inaccurate VIN. The trial court also acted within its discretion in crediting the government's evidence showing that Jo Ware does not exist, including testimony by a realtor who stated that she had no knowledge of a Jo Ware Agency.

Likewise, the court acted within its discretion in rejecting Bales' explanation for the change in his social security number. Bales claimed that he used his first number, 228–46–9555, until he received a memo from a Missouri regional Social Security Administration office in 1983, instructing him to use number 226–48–5559. To support his claim, Bales produced unconvincing witnesses, including his attorney, who stated that he "vaguely remembered" the mix-up over the social security numbers. By contrast, the government produced a longstanding employee of the Social Security Administration, who testified that the records did not show that the two numbers were issued to Bales.

### B. *The Bill of Particulars*

▪ In his motion for a bill of particulars, Bales asked the government to enumerate his alleged illegal acts and false statements. Under Fed.R.Crim.P. 7(f), the court "may direct the filing of a bill of particulars." The defendant, however, has no unconditional right to such a bill. Instead, the granting or denial of a bill is within the court's discretion. *See United States v. Dulin, Jr.*, 410 F.2d 363, 364 (4th Cir.1969).

▪ When each count of an indictment contains the official citation of the statute under which the defendant is charged and the evidence constitutes precise proof of the charges in the indictment, denial of a motion for a bill of particulars is not an abuse of discretion. *See Downing v. United States*, 348 F.2d 594, 599 (5th Cir.), *cert. denied*, 382 U.S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965). The indictment lists Bales' offenses; it even states the precise social security number and allegedly false address which he used. The trial judge, then, acted within his discretion in denying the motion for a bill of particulars.

### C. *The Motion For A New Trial*

On September 9, 1986, Bales filed a motion for a new trial. He based this motion

---

mitment, or loan, or any change or extension of any of the same [shall be guilty of an offense against the United States].

The essential elements of the crime, which the government must prove beyond a reasonable doubt, are:

(1) that the defendant made a false statement to a bank; (2) that he did so for the purpose of influencing the bank's action; (3) that the statement was false as to a material fact; and (4) that the defendant made the false statement knowingly.

*See Bonnette*, 663 F.2d at 497.

on four items of "newly discovered evidence." The district court found that this evidence did not warrant a new trial. We agree.

This circuit has enumerated five requirements for granting a new trial under Fed. R.Crim.P. 33:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*Mills v. United States,* 281 F.2d 736, 738 (4th Cir.1960), quoting *Johnson v. United States,* 32 F.2d 127, 130 (8th Cir.1929).

■ Bales proffered an affidavit by Cain, legal assistant to Bales' attorney. Cain stated that he inspected the disputed Volkswagen and Audi automobiles. His affidavit included blurry photographs of the cars. There was no showing that this evidence could not have been discovered before trial; presumably, the cars existed at that time, and Cain could have filed his affidavit then. "It is equally well settled that evidence is not 'newly discovered' when it was known or could have been known by the diligence of the defendant or his counsel, and ... such evidence is not sufficient to grant a new trial." *United States v. Bujese,* 371 F.2d 120, 125 (3d Cir.1967). Similarly, Bales proffered a court order correcting his birthdate to "5–6–40"—an order which he could have obtained earlier, in anticipation of trial.

■ Bales' "new evidence" also included copies of the tax forms he had completed from 1982 to 1984, which the IRS sent to him after trial, along with form letters. These documents do not necessitate a new trial because they are unlikely to lead to an acquittal. The attached form letters are

blank; the returns themselves do little to refute the government's allegations that they contain false information. This is especially true of the 1982 return, which is signed by the ubiquitous "Jo Ware."

■ Finally, Bales presented a letter from the Social Security Administration in Richmond, confirming that Bales reported that someone else was using his social security number "as early as" 1984. This evidence suffers from two fatal defects: it has little probative value, since it merely relates what Bales himself told the Social Security Administration and it is merely cumulative, since Bales already introduced evidence, which the trial judge chose not to credit, showing that a mix-up occurred with his social security number.

### D. *The Search of Bales' Automobile*

Bales contends that a warrant issued on May 12, 1986, which authorized the search of his Ford "LTD," lacked probable cause, and that any reliance on this warrant was unreasonable. Bales' arguments are unpersuasive in light of the relevant circumstances surrounding the search.

■ The key events spanned a four-day period. On May 9, 1986, FBI Special Agent Carroll arrested Bales for bank fraud. Carroll obtained Bales' consent to search his car in his presence. In a partial search, Carroll uncovered several financial documents. The following day, this agent filed an application for a warrant, with accompanying affidavits, pursuant to Fed. R.Crim.P. 5(a). These affidavits satisfied the "totality of the circumstances" test set out in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Carroll stated that he had previous knowledge of Bales' transactions with Central Fidelity. He also described his discovery of financial documents in Bales' car and a typewriter in the trunk. The affidavits established that Carroll had probable cause to believe the documents in Bales' car were linked to his crime of bank fraud. Thus, the search warrant issued by the magistrate was valid.

In view of the strong showing of probable cause, we need not address Bales' contention that, if the warrant was defective, the government had not met the "good faith" standard articulated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which establishes that a law enforcement officer's good faith belief that probable cause exists excuses reliance upon a defective warrant. We note in passing, however, that Agent Carroll must certainly have believed that probable cause existed, since he had searched Bales' car himself with Bales' consent, and turned up the suspicious documents prior to obtaining the warrant. The affiant's personal knowledge of evidence indicating a crime strongly supports a probable cause determination. *See United States v. Gallo*, 599 F.Supp. 241 (W.D. N.Y.1984).

### E. *The District Court's Refusal to Allow Defense Witnesses to Testify*

Bales contends that the district court's refusal to let three of his witnesses testify is a denial of his sixth amendment rights under the confrontation clause and his fifth amendment due process rights. These witnesses are Cain, the legal assistant of Bales' attorney; Arnold, the businessman who allegedly sold Bales the Volkswagen and the Audi; and Special Agent Carroll.

■ Bales' arguments concerning the latter two witnesses may be rejected out of hand. Bales asserts that Arnold responded to his subpoena, but was "so thoroughly intimidated by FBI agents" who questioned him that he was afraid to testify at trial. He claims that this intimidation constituted a violation of his due process rights under the fifth amendment. In his brief, Bales relies upon *United States v. Ballesteros-Acuna*, 527 F.2d 928 (9th Cir.1975), to support his assertion. In that case, the court indicated that government action making a defense witness unavailable to testify may raise fifth amendment problems. Yet, the *Ballesteros-Acuna* court described only one instance in which such a constitutional violation might occur: the government's deportation of illegal alien witnesses. Certainly, the vaguely alleged "intimidation" of Arnold does not rise to this level of government activity.

■ Bales also challenged the court's refusal to let him call Agent Carroll as an adverse witness in the suppression hearing on July 13, 1986. In evaluating this challenge, we recognize the trial court's broad discretion in delineating the scope of testimony; under appropriate circumstanes, the court may refuse to allow a witness to testify. *See Gajewski v. United States*, 321 F.2d 261, 268 (8th Cir.1963), *cert. denied*, 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416 (1964). Agent Carroll's testimony was especially unnecessary in this case, since defense counsel had already extensively cross-examined Carroll in the earlier suppression hearing on May 13, 1986. *See United States v. Zurosky*, 614 F.2d 779, 792 (1st Cir.1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980) (defendant, who had meaningful opportunity to cross-examine co-defendant when co-defendant testified at suppression hearing, was not denied his confrontation rights under the sixth amendment when his co-defendant did not testify at trial).

■ The exclusion of Cain's testimony presents the only difficult issue. At the close of Bales' case, three of his witnesses, attorneys Smith and Sheffield, and Smith's legal assistant, Cain, were unavailable to testify. The court allowed Smith and Sheffield to testify the following day, since they were tied up in trials. Yet, the judge did not allow Cain, who was assisting Smith at his trial, to testify. Any error in excluding Cain's testimony, however, was harmless. Much of his testimony, including identification of the Volkswagen and the Audi, would have been merely cumulative. Additionally, Bales' sixth amendment argument is completely unfounded. He claims that "the court destroyed the mission of the confrontation clause" in not allowing Cain to testify. Yet, Bales' complaint concerns his ability to call Cain as his *own* witness, who would testify on his behalf, not to confront a witness against him.

### F. Application and Constitutionality Of 42 U.S.C.A. § 408(g)(2)

Bales attacks his convictions under 42 U.S.C.A. § 408(g)(2) (West 1983),[3] which makes false representation of one's social security number a felony. Before discussing the substance of his attack, we note a procedural flaw. Bales' brief, which reaches the fifty-page maximum, see Fed.R. App.P. 28(g), discusses this issue only in outline form. The outline refers to a lengthy section of the Joint Appendix "for a more detailed exposition" of this argument. In similar instances, other courts have stated that arguments incorporated by reference need not be considered on appeal. See, e.g., National Aluminate Corp. v. Permutit Co., 144 F.2d 93, 94 (8th Cir.1944). In this case, it makes little difference whether or not we consider Bales' full argument, since it is wholly unconvincing. He asserts that § 408(g)(2) should not be applied to commercial transactions, such as his bank deals, and that the statute violates first amendment rights to both freedom of religion and privacy.

 Bales argues that § 408(g)(2) does not apply to commercial transactions, but operates only when fraud is perpetrated on the government. He contends that Congress did not intend to reach private transactions, where just "anybody" might be harmed by the falsification of a social security number. Bales, however, cites no legislative history to support his speculations. He also ignores the plain language of the statute, which reaches anyone who, "for the purpose of obtaining anything of value *from any person* or for any other purpose" (emphasis added), falsely represents a number to be his social security number.

 Bales next asks us to take judicial notice of the many Christians in our country, and asserts that § 408(g)(2) violates their first amendment rights to exercise their religious beliefs freely. He quotes *Revelations* and various other books of the Bible which stress the glorification of God's name and the notion that "numbering" of individuals as a form of identification is a great sin. This free exercise argument has two fatal flaws. First, as the government points out in its brief, Bales was not prosecuted for failing to use an assigned number, but for knowingly and intentionally using false numbers for fraudulent purposes. He should not be allowed to avoid a fraud conviction by arguing that the social security numbering system should not have been imposed on him. Additionally, Bales has not demonstrated the existence of a religious belief that will sustain a free exercise claim. See *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). A way of life which is "of deep religious conviction, shared by an organized group, and intimately related to daily living" will satisfy the *Yoder* test. *Id.* at 406 U.S. 216, 92 S.Ct. 1533. The use or nonuse of Bales' social security number on his loan applications and tax returns plainly does not fall into this category. It is more on the order of a "philosophical and personal" belief, which does not garner protection under the first amendment. *Id.* at 406 U.S. 216, 92 S.Ct. 1533.

 As an afterthought, Bales argues that his conviction under § 408(g)(2) violates his constitutional right to privacy. This argument is utterly unsubstantiated. The constitutional right to privacy does not protect the fraudulent acts which Bales committed.

### G. The Double Jeopardy Claim

 The last of Bales' substantive challenges is a double jeopardy claim. Bales argues that the court improperly invoked the findings that he had used a false social security number in counts 6 and 9 to convict him of count 5 (false statement to Dominion) and count 8 (false statement to

---

**3.** 42 U.S.C.A. § 408(g) (West 1983) provides, in pertinent part:

Whoever ... for the purpose of ... obtaining any payment or any other benefit to which he ... is not entitled, or for the purpose of obtaining anything of value from any person, or for any other purpose ... (2) with intent to deceive, falsely represents a number to be the social security account number assigned by the Secretary [of Health and Human Services] to him ... when in fact such number is not the social security account number assigned by the Secretary to him [shall be guilty of an offense against the laws of the United States].

First Virginia), respectively. He cites the test set out in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932): "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not." *Blockburger* may, indeed, be applicable to this situation. The trial court used proof of the same element—falsification of Bales' social security number—to find distinct violations of § 408(g)(2) and § 1014.

Any error, however, is harmless, since proof of the same element is not essential to both convictions. *See, e.g., Alabernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) (defendants' convictions on conspiracy to import marijuana and conspiracy to distribute marijuana under separate statutory sections, and imposition of consecutive sentences, did not violate double jeopardy clause of fifth amendment). "Where a single transaction constitutes two or more offenses but the lesser offense is not necessarily involved in the greater and the facts necessary to convict on the second prosecution would not necessarily have convicted on the first, then the first prosecution is not a bar to the second." 21 *Am.Jur.2d* Criminal Law § 189 (1965). This principle extends to the case at bar. Here, the "lesser offense," falsification of a social security number, was *not necessary* to a finding that Bales had violated § 1014 in counts 5 and 8. In ruling that Bales submitted false statements to the two banks, the court noted that Bales presented a false contract of sale to Dominion (count 5), and presented false tax returns to the government (count 8), among other things. The trial judge easily could have found violations of these two counts without resting upon Bales' falsification of his social security number.

## H. *Restitution*

 In his final argument, Bales attacks the district court's restitutionary award. The court ordered Bales to pay Central Fidelity $7,729.68, allegedly without proof of claim. As Bales notes, the district court must resolve disputes concerning restitution; the government bears the burden of proving the amount of the loss. *See* 18 U.S.C.A. § 3664(d) (West 1985). The government clearly met this burden with respect to Central Fidelity.

The district court based its restitutionary award on information contained in the government's presentence report. The pertinent information appears in two places. The "Victim Impact Statement" reads: "Central Fidelity Bank is the victim in this case. According to Security Officer Earl Rippe, the total loss to the bank is $7,729.68." The "Evaluation" at the close of the report repeats this figure. As a bank official, Rippe was in a position to provide verification of Central Fidelity's loss.

Bales was clearly aware of these statements in the presentence report before he voiced his objections. At the sentencing hearing, defense counsel indicated that Bales had received and read the relevant portions of the report. Only after reviewing the report during the sentencing hearing did Bales attack the restitutionary award. Not only was his attack untimely, it was also inconsistent. Bales' counsel first asserted that there was "no documentation" of the figure. Later in the hearing, she acknowledged this documentation, by noting the figure which Rippe gave to the probation officer. We reject the argument that Rippe's figure does not provide adequate proof of the loss, for the reasons stated above.

Robert E. Bales has failed to convince us that any of the eight errors he assigns require a reversal. Bales' convictions, then, must stand. The results of Bales' dealings with the three banks are somewhat different than he expected. Instead of receiving loans and a line of credit on false information, Bales receives a jail sentence and a restitutionary order.

AFFIRMED.